■ JAMES J. DUFFY et al., as Trustees of the Local 138, 138A and 138B, International Union of Operating Engineers Industry Promotion Fund, Appellants, v. BENJAMIN R. SCHENCK, as Superintendent of Insurance of the State of New York, Respondent.— In an action for a judgment declaring that defendant, the Superintendent of Insurance, lacks authority to supervise a certain "Industry Promotion Fund" and to enjoin him from exercising such authority, plaintiffs appeal from an order-judgment of the Supreme Court, Nassau County, dated March 8, 1973, which granted defendant's motion to dismiss the complaint for failure to state a cause of action and declared that the fund is subject to defendant's jurisdiction, review and investigation. Order-judgment affirmed, with $20 costs and disbursements. On July 1, 1966, pursuant to the terms of a collective bargaining agreement, an agreement and declaration of trust was executed by the plaintiff International Union of Operating Engineers, Locals 138, 138A and 138B, of Nassau and Suffolk Counties (the union), and the Nassau and Suffolk Contractors Association, the Building Trades Employers Association and certain individual contractors (collectively the employers). The declaration of trust established a so-called "Industry Promotion Fund" into which weekly contributions were to be paid by employers based upon a percentage of the wages paid to their employees. By the terms of the declaration of trust, the Fund was to be administered by eight directors, four to be designated by the union and four by the employers. Following a preamble which alludes to "employees who are covered and entitled to the benefits of this agreement" and includes a statement that the purposes of the Fund are "singly motivated for the benefit, advancement, improvement and promotion of the construction industry and/or Local Union," the declaration rather vaguely states that the assets of the Fund may be expended "to secure safety education programs, to promote and foster harmony between labor organizations and

parties to the collective bargaining agreement, and to maintain and increase the good will value in public and industrial relations between the employer and members of this organization." Shortly after its establishment, the Fund was registered with the defendant Superintendent of Insurance pursuant to section 37-b of the Insurance Law, although plaintiffs allege that the registration was a mistake, having been effected by the Fund's accountants without the advice of counsel. In 1968, and apparently subsequent thereto, an examination was conducted by the Superintendent into the books and records of the Fund, over objection by its attorneys as to his jurisdiction. By citation dated August 29, 1972, the directors of the Fund were required by the Superintendent to appear at a hearing in connection with a charge of depletion of assets of the Fund. The specifications of the charge included unauthorized expenditures for such purposes as political contributions, annual picnics, purchase of jewelry and television sets for union officials and other unknown persons, purchase of tickets to sporting events for the benefit of unidentified persons and the chartering of helicopter flights by unidentified persons and for unspecified purposes, totaling substantially more than $500,000. Plaintiffs, the directors of the Fund, commenced the instant action on the theory that the Fund is not within the purview of article III-A of the Insurance Law, so that the Superintendent has no authority to supervise and regulate its activities. The question we are called upon to determine is whether the Fund is an employee welfare fund within the meaning of article III-A. The statute defines an employee welfare fund, in part, as a fund established to provide "employee benefits" (Insurance Law, § 37-a, subd. 1). "Employee benefits" are defined as "one or more benefits or services for employees or their families or dependents, or for both, including, but not limited to, medical, surgical or hospital care benefits, benefits in the event of sickness, accident, disability or death, benefits in the event of unemployment, or retirement benefits" (Insurance Law, § 37-a, subd. 2). In dealing with statutes involving the health and safety of employees, the Court of Appeals has said that such statutes are to be construed liberally in an endeavor to provide the protection of the law "where protection is needed and where the operations conducted are of the sort as to which the Legislature wished to protect employees" (*Red Hook Cold Stor. Co.* v. *Department of Labor,* 295 N. Y. 1, 7). That principle is no less applicable where we are dealing with a statute which seeks to protect the financial interests of the working man. In enacting article III-A, which subjects employees welfare funds to the supervision of the Superintendent of Insurance, the Legislature expressed the policy of the State to be that the establishment and management of such funds are of vital public interest and that such funds should be supervised to the extent necessary to protect the rights of the employees and their families for whose benefit they were or are established (Insurance Law, § 37). While the statute does set forth specific types of benefits encompassed within the term "employee benefits", the list is expressly "not limited to" those items (Insurance Law, § 37-a, subd. 2). Clearly, it was not the overriding intent of the Legislature to strictly limit the application of the statute. It is more reasonable to assume that the Legislature intended to safeguard all jointly administered funds established by employer contributions for the direct or indirect welfare and benefit of employees. In *McKay* v. *Stewart* (29 N Y 2d 563, cert. den. *sub nom. Cecire* v. *Stewart,* 405 U. S. 1040), the Court of Appeals held that a vacation fund created for the purpose of paying earned vacation wages to employees fell within the scope of article III-A and constituted a benefit within the statutory definition. Plaintiffs adopt the untenable position that the Fund was not intended to confer benefits upon the employees

either directly or indirectly. For whose benefit, one may then ask, was it created? Surely not for the benefit of the directors of the Fund or the hierarchy of the union. If created solely for the benefit of the employers it would not have been the subject of collective bargaining. The reasonable conclusion to be drawn is that the Fund was established, at least in part, to provide benefits which would flow to the union as a whole rather than directly to each individual employee. That being the case, it may be said that the purpose of the Fund was to benefit the employees, at least indirectly, since what is a labor union but the creature of the men and women it purports to represent? The true nature of the Fund is perhaps best revealed by the language in the declaration which alludes to the employees upon whose wages contributions are to be computed as those who are "covered and entitled to the benefits" provided therein. It is also to be observed that subdivision (f) of paragraph SIXTH of the declaration authorizes the directors to make payments from the assets of the Fund to the welfare and pension funds of the locals in order to provide such benefits to the employees of the Fund. Thus, in that incidental fashion, the operations of the Fund fall squarely within the scope of the statute. We therefore hold that the "Industry Promotion Fund" is reasonably within the scope of article III-A of the Insurance Law. In so doing, we rely also on the fact that the Attorney-General has rendered an opinion that industry promotion plans are within the scope of the statute and that it appears, in reliance upon that opinion, that this has been the uniform administrative interpretation (1963 Opns. Atty. Gen. 35; *McKay* v. *Stewart*, 29 N Y 2d 563, 565, *supra*). Martuscello. Acting P. J., Gulotta, Christ, Brennan and Benjamin, JJ., concur. [73 Misc 2d 72.]